ALDRICH LAW FIRM, LTD.
John P. Aldrich, Esq. (SBN #6877)
1601 S. Rainbow Blvd., Suite 160
Las Vegas, Nevada 89146
Telephone: (702) 853-5490
Facsimile:  (702) 227-1975
jaldrich@johnaldrichlawfirm.com

KESSLER TOPAZ MELTZER & CHECK, LLP
Eric L. Zagar, Esq.
James H. Miller, Esq.
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| IRON WORKERS DISTRICT COUNCIL (PHILADELPHIA AND VICINITY) RETIREMENT AND PENSION PLAN, derivatively on behalf of nominal defendant DISH NETWORK CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>CHARLES W. ERGEN, JOSEPH P. CLAYTON, JAMES DEFRANCO, CANTEY M. ERGEN, STEVEN R. GOODBARN, DAVID K. MOSKOWITZ, TOM A. ORTOLF and CARL E. VOGEL,<br><br>Defendants,<br><br>and<br><br>DISH NETWORK CORPORATION,<br><br>Nominal Defendant. | Case No.<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**JURY DEMAND** |

1

Plaintiff, Iron Workers District Council (Philadelphia and Vicinity) Retirement and Pension Plan ("Iron Workers" or "Plaintiff") brings the following Verified Amended Shareholder Derivative Complaint (the "Complaint") on behalf of nominal defendant DISH Network Corporation ("DISH" or the "Company") against the Company's founder, chairman, and controlling shareholder, Charles W. Ergen ("Ergen"), and the other members of the board of directors of DISH (the "DISH Board" or "Board"). The allegations of the Complaint are based on the knowledge of Plaintiff as to itself, and on information and belief, including the investigation of counsel and review of publicly available information, as to all other matters.

**INTRODUCTION**

1.      Defendant Ergen is DISH's controlling stockholder. He owns 52% of DISH's outstanding equity, and more than 88% of the Company's voting power. Moreover, Ergen decides and directs DISH's strategic plans.

2.      In April 2012, Ergen began personally acquiring senior secured debt in a bankrupt satellite communications company called LightSquared L.P. ("LightSquared"). By May 2013, Ergen had acquired more than $1 billion of LightSquared debt at an average cost of approximately $0.84 on the dollar. Ergen made these purchases with the knowledge that DISH was actively engaged in, and would continue to be engaged in, the acquisition of wireless spectrum necessary to diversify DISH from a satellite television provider to a broader communications company. Ergen also made these purchases knowing DISH would seek to acquire LightSquared as part of this strategy.

3.      As a result of these transactions, Ergen became LightSquared's largest secured creditor and stood to gain handsomely when LightSquared was eventually purchased out of bankruptcy. Despite Ergen's and the Board's knowledge that DISH would be interested in acquiring LightSquared, Ergen's purchases of LightSquared debt were not and have not been

1

approved by the Board or its audit committee (the "Audit Committee") even though the Board has adopted a written policy requiring Board and Audit Committee approval of all related party transactions.

4.     In May 2013, Ergen bid $2 billion to buy substantially all of LightSquared's assets out of bankruptcy, thereby setting a "floor" for any subsequent bid.  Shortly thereafter, Ergen caused DISH to attempt to acquire LightSquared out of bankruptcy at a price approximately 10% higher than Ergen's initial bid despite the fact that no other potential bidder existed.  As a result of this substantial conflict of interest between DISH and Ergen, the DISH Board formed a two-person special committee (the "Special Committee") to consider DISH's potential acquisition of LightSquared.  According to an article published by the *Wall Street Journal*, the Special Committee was expected to have an ongoing role in the deal discussions.  They were concerned the deal could look bad, given Mr. Ergen's personal interest, and wanted to keep open the possibility that Mr. Ergen could direct some of his gains on the purchase of LightSquared debt to DISH shareholders.

5.     Rather than allow the Special Committee to fulfill its responsibilities and protect DISH, Ergen clashed with, undermined and prematurely disbanded the Special Committee on July 21, 2013.  As a result of Ergen's actions, one of the two members of the Special Committee resigned from the Board, leaving DISH in violation of NASDAQ listing requirements relating to independent directors.

6.     On July 23, 2013, DISH topped Ergen's pending LightSquared bid, offering an additional $220 million, even though no other bidder had topped Ergen's $2 billion offer.  Thus, Ergen's initial bid already has potentially harmed DISH by over $200 million.  DISH's bid was made as part of a reorganization plan proposed by LightSquared secured lenders (including Ergen), positioning DISH to enjoy the considerable advantages of being designated a "stalking horse bidder" in LightSquared's bankruptcy.  The DISH bid was purportedly "recommended" by the

Special Committee, although DISH's disclosures do not say what, exactly, the Special Committee recommended, whether the Special Committee was unanimous or whether the Special Committee attached any conditions to its recommendation, such as the Special Committee's continued involvement in the bidding process.

7.    With the Special Committee disbanded and its LightSquared bid controlled by Ergen, DISH's predicament only got worse.   On August 6, 2013, LightSquared's principal shareholder, Harbinger, sued both DISH and Ergen, alleging that Ergen's LightSquared debt purchases (which he had not disclosed to the DISH Board) and DISH's takeover bid are part of a fraudulent conspiracy to manipulate the bankruptcy process (the "Harbinger Lawsuit").   On August 22, 2013, LightSquared filed a notice of intent to intervene as a plaintiff in the Harbinger Lawsuit, joining in a claim that seeks to equitably disallow Ergen's claims in bankruptcy based on his secret debt purchases.

8.    On August 30, 2013, in an effort to prevent Ergen and DISH from acquiring LightSquared, Harbinger filed its own reorganization plan seeking to reorganize LightSquared without selling LightSquared's spectrum.   Based on Ergen's prior misconduct and DISH's failure to act independently of Ergen, Harbinger asserts that DISH "Is Not A Good Faith Purchaser."

9.    Through the Harbinger Lawsuit and proposed reorganization plan, Harbinger and LightSquared seek, among other things, (a) $4 billion in damages from Ergen and DISH, (b) to disallow Ergen's debt claims, (c) a finding that DISH is not a "good faith" bidder and therefore should not get the benefits of its stalking horse position and (d) possibly that DISH should be limited from participating in the bidding process, which is set to begin in a matter of weeks and will conclude by December 6, 2013.

10.    The Harbinger Lawsuit poses substantial, imminent harm to DISH, as Ergen and the Board are fully aware.   Sadly, this situation is not new to DISH.   Just a few years ago, Ergen caused

3

DISH to purchase the debt of another spectrum owner called DBSD North America, Inc. ("DBSD"), and then used DISH's creditor position to manipulate that bankruptcy process. The bankruptcy court, federal district court and Second Circuit Court of Appeals uniformly found that DISH's vote against a competing reorganization plan should be disqualified because DISH's debt purchases were made to manipulate the bankruptcy proceedings and, thus, not made in good faith. *See In re DBSD North America, Inc.*, 421 B.R. 133, 139-40 (S.D.N.Y. Bankr. 2009); *In re DBSD North America, Inc.*, 2010 WL 1223109 (S.D.N.Y. March 24, 2010), *aff'd in part and rev'd in part on other grounds*, 627 F.3d 496 (2d Cir. 2010); and *In re DBSD North America, Inc.*, 634 F.3d 79, 104 (2d Cir. 2011).

11.     The Board's decision to allow Ergen to continue to control the LightSquared bidding despite (a) Ergen's substantial interests in LightSquared as its largest secured creditor, (b) the *DBSD* experience and (c) the Harbinger Lawsuit and bankruptcy reorganization proposal seeking a finding that DISH again acted in bad faith, constitutes an ongoing breach of fiduciary duty by the Board.

12.     Furthermore, the Board and Audit Committee's failure to approve Ergen's purchases of LightSquared debt, in contravention of Company policy, constitutes a further breach of fiduciary duty. As a result of Ergen's debt purchases, and the remaining Individual Defendants' repeated failure to take action, Ergen will be unjustly enriched upon the sale of LightSquared.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.

14.     Venue is proper in this district because a substantial portion of the transactions and

4

wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this district.   One or more of the Defendants either resides in or maintains executive offices in this district, and Defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## THE PARTIES

15.     Plaintiff currently owns shares of DISH Class A common stock, owned such shares at the time the events and transactions complained of herein transpired, and will continue to own DISH Class A common stock throughout this litigation.  Plaintiff is a citizen of the Commonwealth of Pennsylvania.

16.     Nominal Defendant DISH, through its subsidiary DISH Network L.L.C., provides satellite TV services to approximately 14 million customers, as of March 31, 2013.   DISH is incorporated under the laws of the State of Nevada, with its principal executive offices located at 9601 South Meridian Boulevard, Englewood, Colorado.  The Company is publicly traded on the NASDAQ under the ticker symbol "DISH."

17.     Defendant Ergen is the founder, Chairman and controlling shareholder of DISH. Ergen beneficially owns approximately 52.1% of the Company's total equity and possesses approximately 88.0% of the Company's total voting power through his ownership of 96% of the Company' super-voting Class B common stock.  Ergen co-founded DISH in 1980 with his wife, Cantey Ergen, and James DeFranco ("DeFranco").  From the Company's founding until June 2011, Ergen held DISH's Chief Executive Officer ("CEO") and Chairman positions.  Upon information and belief, Ergen is a citizen of the State of Colorado.

18.     Defendant Joseph P. Clayton ("Clayton") currently serves as the Company's President and CEO and has served on the DISH Board since June 2011.  Clayton previously served

on the board of directors of EchoStar, another Ergen-controlled company from which DISH was spun-off in 2008, from October 2008 until June 2011. Upon information and belief, Clayton is a citizen of the State of Indiana.

19.    Defendant DeFranco is one of the Company's Executive Vice Presidents and has been one of DISH's vice presidents and a member of the DISH Board since the Company's formation in 1980. DeFranco co-founded DISH with Charles Ergen and Cantey Ergen in 1980. Upon information and belief, DeFranco is a citizen of the State of Colorado.

20.    Defendant Cantey Ergen is Charles Ergen's wife, has served on the DISH Board since May 2001, is currently a senior advisor to the Company, and has had a variety of operational responsibilities with DISH since the Company's formation. Cantey Ergen co-founded DISH with her husband and DeFranco. Upon information and belief, Cantey Ergen is a citizen of the State of Colorado.

21.    Defendant Steven R. Goodbarn ("Goodbarn") has served as a member of the DISH Board since December 2002. Goodbarn served as a member of the board of directors of EchoStar from its formation in October 2007 until November 2008. Upon information and belief, Goodbarn is a citizen of the State of Colorado.

22.    Defendant David K. Moskowitz ("Moskowitz") has served as a member of the DISH Board since 1998. Moskowitz is one of the Company's senior advisors and was an Executive Vice President as well as the Company's Secretary and General Counsel until 2007. Moskowitz joined DISH in March 1990. Moskowitz performs certain business functions for DISH and its subsidiaries from time to time. From October 2007 until May 2012, Moskowitz served as a member of the board of directors of EchoStar. Upon information and belief, Moskowitz is a citizen of the State of Colorado.

23.    Defendant Tom A. Ortolf ("Ortolf") has served as a member of the DISH Board

6

since May 2005.  Ortolf served as DISH's President and Chief Operating Officer from 1988 until 1991.  He also has served as a member of the board of directors of EchoStar since October 2007.  Upon information and belief, Ortlof is a citizen of the State of Colorado.

24.    Defendant Carl E. Vogel ("Vogel") has served as a member of the DISH Board since May 2005 and is currently a senior advisor to the Company.  He served as DISH's President from September 2006 until February 2008 and served as the Company's Vice Chairman from June 2005 until March 2009.  From October 2007 until March 2009, Vogel served as the Vice Chairman of the board of directors of, and a senior advisor to, EchoStar.  He was also one of the Company's executive officers from 1994 until 1997, including serving as DISH's President from 1995 until 1997.  Upon information and belief, Vogel is a citizen of the State of Colorado.

25.    Defendant George R. Brokaw ("Brokaw") has served as a member of the DISH Board and Audit Committee since September 17, 2013.  Upon information and belief, Brokaw is a citizen of the State of New York.

26.    The defendants listed in paragraphs 17 through 25 above are collectively referred to herein as the "Individual Defendants" or the "Director Defendants."

## SUBSTANTIVE ALLEGATIONS

## I.    HISTORY OF DISH AND ERGEN'S CONTROL OF THE COMPANY

27.    In 1980, Ergen, Cantey Ergen and DeFranco founded Echostar, and Ergen and DeFranco started selling satellite dishes door-to-door in Colorado.  EchoStar began using DISH Network as its consumer brand in March 1996, after the successful launch of its first satellite, EchoStar I, in December 1995.

28.    In January 2008, EchoStar spun off DISH.  DISH now provides subscription satellite TV service and EchoStar owns and operates the technology and infrastructure, including the satellites, which DISH utilizes to provide its services.

29.    Ergen dominates and controls both EchoStar and DISH's business and affairs the

7

same way he did upon their founding.  As of the Company's March 22, 2013 definitive proxy statement in connection with DISH's 2013 annual meeting of shareholders (the "2013 Proxy"), Ergen owned more than 52% of the Company's outstanding equity and more than 88% of the Company's voting power through his ownership of Class A and super-voting Class B stock.

30.     Indeed, DISH concedes, as it must, Ergen's control of the Company.  For example, DISH's annual report filed with the SEC on February 20, 2013, states:

> Through his voting power, ***Mr. Ergen has the ability to elect a majority of our directors and to control all other matters requiring the approval of our stockholders***.  As a result, DISH network is a "controlled company" as defined in the Nasdaq listing rules and is, therefore, not subject to Nasdaq requirements that would otherwise require us to have:  (i) a majority of independent directors; (ii) a nominating committee composed solely of independent directors; (iii) compensation of our executive officers determined by a majority of the independent directors or a compensation committee composed solely of independent directors; and (iv) director nominees selected, or recommended for the Board's selection, either by a majority of the independent directors or a nominating committee composed solely of independent directors.  (Emphasis added)

31.     As further stated in the 2013 Proxy:

> ***We are a "controlled company"*** within the meaning of the NASDAQ Marketplace Rules because more than 50% of our voting power is held by Charles W. Ergen, our Chairman.   Mr. Ergen beneficially owns approximately 52.1% of our total equity securities and possesses approximately 88.0% of the total voting power.  (Emphasis added)

32.     The 2013 Proxy further states that "[t]he Board concluded that Mr. Ergen should continue to serve on the Board due to, among other things, ***his role as our co-founder and controlling shareholder*** …" and "[t]he Board of Directors places substantial weight on Mr. Ergen's recommendations in light of ***his role as Chairman and as co-founder and controlling shareholder of DISH Network***."  (Emphasis added)

33.     Ergen's control over the Company and the Board is further highlighted by the numerous transactions he has caused DISH to enter with members of his immediate family.  For example, in 2012, DISH invested $500,000 in Yottabytes Ventures LLC, a technology start-up in

which Ergen's son, Christopher, holds a significant ownership stake.  Similarly, in 2011, DISH paid $100,000 to an online marketing company that is fifty percent owned by another of Ergen's children, Chase.  Moreover, Cantey Ergen serves as a senior adviser to the Company and was paid approximately $100,000 during 2012 for her purported services to the Company.

## II.    DISH ACQUIRES WIRELESS SPECTRUM IN AN ATTEMPT TO DIVERSIFY

34.    When Ergen stepped down as CEO of DISH in 2011, he personally selected Clayton to replace him.  Ergen wanted to focus on the Company's strategic direction.  According to Clayton, he was "freeing Charlie to focus on the big picture."   Thus, Ergen's specific current work responsibility for DISH centers on finding strategic opportunities, such as the opportunity to buy LightSquared debt and the bankrupt company itself.

35.    DISH has been an extremely successful pay satellite TV company since its founding more than 30 years ago.  However, the satellite TV business generally has started to decline as consumers turn to other devices to watch video on the web rather than on TV.  As a result, DISH's subscriber base has increased at an average rate of just 0.4% for the past five years.  This turn to internet-based television viewing poses a substantial threat to DISH.  Indeed, as one consultant, Chetan Sharma of Chetan Sharma Consulting, has observed, "[i]f [DISH doesn't] have some form of wireless play, then it's very hard for them to survive longer term."

36.    As the strategic visionary and director of the Company, Ergen is well aware of the need to diversify the Company's business.  Five years ago, Ergen determined that "the wireless side was probably a place we needed to go."  Ergen added that "[i]deally we [*i.e.*, DISH] would compete against the AT&T and Verizons … and to do that, we would need more [wireless] spectrum."

37.    DISH spent more than $3.5 billion in its effort to become a wireless player.  In 2008, DISH spent $712 million to acquire certain 700 MHz wireless spectrum licenses.  Then, in March 2012, DISH spent an additional $2.86 billion to complete acquisitions in bankruptcy of 100% of the equity of DBSD and substantially all of the assets of TerreStar Networks, Inc., pursuant to which

9

DISH acquired, among other things, 40 MHz of 2 GHz wireless spectrum licenses.

38.     The DBSD transaction is remarkably similar to Ergen's and DISH's current efforts to acquire LightSquared.  The court overseeing that bankruptcy found that DISH was not acting in good faith in connection with the DBSD transaction and therefore invalidated DISH's vote against a competing reorganization plan.  Ultimately DISH was able to acquire DBSD's spectrum.  However, the Company was forced to expend additional time and money as a consequence of its bad faith tactics.

39.     In furtherance of the Company's strategy to become a wireless player, in May 2013, DISH also proposed a merger with Sprint-Nextel Corporation ("Sprint") and raised approximately $2.5 billion for the proposed merger.  DISH then offered to acquire Clearwire Corporation ("Clearwire"), the holder of a significant amount of wireless spectrum.  DISH, however, was unsuccessful in its attempts to acquire either Sprint or Clearwire.  Accordingly, DISH continued to seek additional sources of wireless spectrum because, as Ergen has publicly stated, DISH is not in a good position to build out a network "from scratch," and has focused its attention on finding a "partner" to build out a wireless network for purposes of "entering into the marketplace," where there were, and continue to be, very few "dance partners."

## III.     THE LIGHTSQUARED BANKRUPTCY

40.     LightSquared is a wireless company focused on developing a nationwide, fourth generation wireless high-speed data communication network for mobile phones and data terminals. LightSquared's goal was to build a network that would provide high-speed voice and data coverage to 92% of the U.S. population by 2015.  LightSquared's potential customers included mobile data and telephone providers that would purchase spectrum from LightSquared and, in turn, allow their own customers access to LightSquared's network.

41.     LightSquared acquired large amounts of wireless spectrum in the "L-Band" that it intended to use to transmit data wirelessly.  Until recently, the L-Band consisted of numerous thin

10

slices of airwaves, scattered across the band.  This configuration rendered it extremely difficult to use the L-Band for a conventional wireless network.  However, LightSquared reorganized the L-Band by bundling the slices into more usable blocks.  According to Lance Vitanza, a senior telecom analyst at brokerage CRT Capital Group, this spectrum, if made marketable, could be worth "in excess of $10 billion."

42.     But use of the L-Band was not that simple.  LightSquared's L-Band wireless network could potentially interfere with adjacent spectrum that is used for global positioning system ("GPS") signals.  Accordingly, federal regulators raised a concern that LightSquared's L-Band network would overwhelm the GPS signal, rendering GPS devices unusable.

43.     LightSquared had assumed approximately $1.7 billion of private secured debt to build out its wireless network.  When the market learned of LightSquared's regulatory issues, creditors became concerned.  As a result, LightSquared's debt was trading as low as forty cents on the dollar in late 2011 and early 2012.

44.     On February 14, 2012, the Federal Communications Commission (the "FCC") announced that it intended to suspend LightSquared's wireless spectrum license until conflicts with the GPS system were resolved.  The FCC cited concerns from the National Telecommunication and Information Administration, a federal agency that coordinates spectrum uses for the military and other federal government entities, that "there is no practical way to mitigate potential interference at this time."  Although this order was technically appealable, a February 15, 2012 *Wall Street Journal* article entitled "Start-Up's Network Rejected; GPS Cited" noted that "the unanimity among the federal agencies left little room for LightSquared to maneuver."

45.     On May 14, 2012, LightSquared filed a petition pursuant to Chapter 11 of the Bankruptcy Code in the bankruptcy court for the Southern District of New York.  Around this time, LightSquared debt was trading around fifty cents on the dollar.

### IV.    ERGEN ACQUIRES LIGHTSQUARED DEBT AND MAKES A PERSONAL BID FOR LIGHTSQUARED

46.    Recognizing that LightSquared was in distress, and that its valuable assets could be acquired at a substantial discount to market, Ergen created an investment vehicle named SP Special Opportunities, LLC ("Sound Point") to purchase LightSquared debt.  Ergen then purchased over one billion dollars of LightSquared debt securities beginning in April 2012, as follows:

| Trade Date | Closing Date | Par Value of Purchase (in dollars) | Trading Price of LightSquared Debt at Time of Trade (% of par) | Market Value of Purchase at Time of Trade (in dollars) |
|---|---|---|---|---|
| 4/13/12 | 9/6/12 | 5,000,000.00 | 48.75 | 2,437,500.00 |
| 5/3/12 | 7/23/12 | 4,545,500.00 | 44.00 | 2,000,020.00 |
| 5/3/12 | 7/26/12 | 20,000,000.00 | 44.00 | 8,800,000.00 |
| 5/3/12 | 9/6/12 | 3,000,000.00 | 44.00 | 1,320,000.00 |
| 5/3/12 | 9/6/12 | 2,000,000.00 | 44.00 | 888,000.00 |
| 5/3/12 | 7/23/12 | 5,000,000.00 | 44.00 | 2,200,000.00 |
| 5/4/12 | 5/31/12 | 247,259,046.62 | 59.00 | 145,882,837.51 |
| 10/4/12 | 11/30/12 | 19,417,287.99 | 74.50 | 14,465,879.55 |
| 10/23/12 | 2/6/13 | 3,000,000.00 | 84.50 | 2,535,000.00 |
| 11/15/12 | 1/8/13 | 7,997,057.00 | 84.50 | 6,757,513.17 |
| 12/12/12 | 6/11/13 | 2,000,000.00 | 84.50 | 1,690,000.00 |
| 12/13/12 | 3/12/13 | 7,000,000.00 | 84.50 | 5,915,000.00 |
| 12/20/12 | 4/9/13 | 14,782,302.32 | 88.50 | 13,082,337.55 |
| 12/28/12 | 3/13/13 | 15,000,000.00 | 88.50 | 13,275,000.00 |
| 1/2/13 | 3/7/13 | 20,000,000.00 | 100.50 | 20,100,000.00 |
| 1/2/13 | 4/5/13 | 6,000,000.00 | 100.50 | 6,030,000.00 |
| 1/3/13 | 3/7/13 | 17,999,999.97 | 100.50 | 18,089,999.97 |
| 1/7/13 | 5/24/13 | 7,000,000.00 | 88.00 | 6,160,000.00 |
| 1/14/13 | 5/24/13 | 9,410,420.00 | 90.00 | 8,469,378.00 |
| 2/1/13 | ----- | 20,000,000.00 | 91.50 | 18,300,000.00 |
| 3/25/13 | 5/24/13 | 88,262,536.00 | 94.00 | 82,966,783.84 |
| 3/28/13 | ----- | 168,759,227.85 | 91.50 | 154,414,693.48 |
| 4/1/13 | 6/25/13 | 5,500,000.00 | 100.00 | 5,500,000.00 |
| 4/19/13 | 6/14/13 | 122,250,172.79 | 97.50 | 119,193,918.47 |
| 4/26/13 | 6/18/13 | 145,712,408.57 | 97.50 | 142,069,598.36 |
| 4/26/13 | 6/18/13 | 46,186,366.57 | 97.50 | 45,031,707.41 |
|  |  |  |  |  |
| **TOTALS** |  | **$1,013,082,326.30** |  | **$847,567,167.30** |

47.    At the time Ergen made these purchases he knew that DISH would ultimately make a play to buy LightSquared.  Ergen misappropriated DISH's confidential strategic plans to bolster his

personal attempt to profit on LightSquared debt.  However, Ergen did not disclose to the Board or Audit Committee that he was spending nearly $1 billion to purchase LightSquared debt.  Nor did Ergen disclose that he controlled Sound Point.

48.     According to the 2013 Proxy, the Board "has adopted a written policy for the review and approval of transactions involving DISH Network and related parties, such as directors, executive officers (and their immediate family members) and EchoStar"—*i.e.*, "related party transactions".  "The Audit Committee and the Board of directors must approve [related party] transactions, with all interested parties abstaining from the vote."  Moreover, "[o]nce each calendar year, the Audit Committee and the Board of directors undertake a review of all recurring potential related-party transactions.  Both the Audit Committee and the Board of Directors must approve the continuation of each such [related party] transaction, with all interested parties abstaining."

49.     In light of Ergen's knowledge that DISH would be interested in acquiring LightSquared and that DISH would ultimately seek to acquire LightSquared, Ergen's purchases of LightSquared debt constituted a related party transaction.  However, Ergen's purchases of LightSquared debt did not receive approval of either the Audit Committee or the Board.  Indeed, they could not have because Ergen did not tell the Audit Committee or the Board about his debt purchases until after they were conducted.  Moreover, the Special Committee that purportedly approved DISH's bid to acquire LightSquared consisted of only Goodbarn and Howard.  According to the 2013 Proxy, the Audit Committee consisted of Goodbarn, Howard and Ortolf.  Thus, the Special Committee could not have served as a proxy for Audit Committee approval.

50.     Having locked in his personal position in LightSquared, Ergen set in motion his plan to cause either DISH or another company he controlled to buy LightSquared's assets out of bankruptcy at a price that would personally benefit Ergen.

51.     On May 15, 2013, Ergen, through an entity named L-Band Acquisition, LLC

("LBAC"), a Delaware limited liability company controlled by Ergen, personally made an offer for substantially all of the assets of LightSquared for $2 billion in cash (the "Ergen Offer"). The Ergen Offer set a floor price in any bankruptcy auction for LightSquared's assets. Moreover, the Ergen Offer effectively ensured that Ergen would profit handsomely from his LightSquared holdings. Indeed, according to media sources, including *The Denver Post*, "Ergen stands to make **hundreds of millions of dollars** in profits **personally** if Dish's bid for … LightSquared succeeds[.]"  (Emphasis added.)

52.     The Board formed the Special Committee only ***after*** learning about Ergen's personal bid for LightSquared's assets. The Special Committee was established to determine whether DISH would make a competing bid to the Ergen Offer. To facilitate DISH's acquisition efforts, and in light of the fact that Ergen could not directly compete with DISH to acquire LightSquared, Ergen transferred LBAC to DISH.

## V.     DISH BIDS $2.2 BILLION AND HOWARD ABRUPTLY RESIGNS

53.     On July 23, 2013, a group of LightSquared's secured creditors, including Ergen (the "Secured Group"), submitted a bankruptcy plan that, if approved, will result in the sale of LightSquared's assets in a public auction. In connection with the Secured Group's plan, DISH submitted a "stalking horse agreement" whereby LBAC (now controlled by DISH) will acquire substantially all of LightSquared's assets for approximately $2.2 billion in cash and the assumption of certain obligations.

54.     Thus, despite Ergen's transferring of LBAC to DISH, Ergen did not transfer his $2 billion offer with it. Only two months earlier – when LBAC was still funded by Ergen – LBAC had offered to buy the same LightSquared spectrum assets for $2 billion. Yet DISH increased its offer by approximately $200 million despite that no other bidder existed.

55.     In bankruptcy, a "stalking horse bidder" typically reaches an agreement with the

debtor in order to serve as a floor in a Court-supervised auction of the debtor's assets.  DISH's proposed stalking horse agreement contains significant deal protections that, if approved, will make DISH (as LBAC's designee) the leading contender to acquire LightSquared's spectrum assets.  For example, the proposed stalking horse agreement entitles LBAC to receiving a break-up fee of 3% of the ultimate purchase price (based on DISH's $2.2 billion bid, **at least $66 million**) if it is not the winning bidder in the auction.  The proposed stalking horse agreement and the related "bid procedures" also contain additional provisions designed to further favor DISH and Ergen.  For instance, there is a $50 million incremental bid requirement.  Thus, the cost to an alternative bidder to top DISH's offer will be an additional $118,600,000 to account for the break-up fee, incremental bid and additional costs owed to DISH.  Thus, LBAC (and in turn DISH as its designee) will enjoy significant advantages during the proposed bankruptcy auction of LightSquared's spectrum assets if the Secured Group plan and the stalking horse agreement are approved.

56.  On July 23, 2013, the Company filed with the SEC a Form 8-K disclosing DISH's $2.2 billion bid, stating in its entirety as follows:

> On July 23, 2013, L-Band Acquisition, LLC ("L-Band"), a wholly-owned subsidiary of DISH Network Corporation ("DISH"), formed to make a bid to acquire assets of LightSquared LP, entered into a Plan Support Agreement (the "PSA") with certain senior secured lenders to LightSquared LP. DISH is a party to the PSA solely with respect to certain guaranty obligations. DISH's Board of Directors (the "Board") approved entering into the PSA based, among other things, on the recommendation of a special committee of the Board (the "Special Committee") and a fairness opinion that was prepared by a financial advisory firm at the request of the Special Committee.
>
> Pursuant to the PSA, L-Band and such lenders have agreed, subject to the terms and conditions set forth therein, to support and pursue confirmation of a plan of reorganization (the "LightSquared LP Plan") for LightSquared LP and certain of its subsidiaries that are debtors and debtors in possession (collectively, the "LightSquared LP Entities") in pending bankruptcy cases under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), which cases are jointly administered under the caption In re LightSquared Inc., et. al., Case No. 12-12080 (SCC).

15

The LightSquared LP Plan contemplates a sale of substantially all of the assets of the LightSquared LP Entities to L-Band for a purchase price of $2.22 billion in cash, plus the assumption of certain liabilities, pursuant to the terms and conditions of a proposed asset purchase agreement (the "Proposed APA"). L-Band's purchase offer under the LightSquared LP Plan is subject to the submission of higher and better offers in accordance with certain bid procedures to be proposed in connection with the LightSquared LP Plan. In addition, the LightSquared LP Plan is subject to confirmation by the Bankruptcy Court. The Proposed APA has not been negotiated with, or executed by, the LightSquared LP Entities. Consummation of the acquisition contemplated under the Proposed APA is subject to, among other things, Bankruptcy Court, Federal Communications Commission ("FCC") and Canadian federal Department of Industry ("Industry Canada") approvals. However, funding of the purchase price under the Proposed APA is not conditioned upon receipt of approvals from the FCC or Industry Canada. DISH would be a party to the Proposed APA solely with respect to certain guaranty obligations.

The foregoing description of the PSA and the transactions contemplated thereby do not purport to be complete and are qualified in their entirety by reference to the PSA, a copy of which is filed as an exhibit to this Form 8-K.

57.    The July 23, 2013 8-K did not disclose the Special Committee's membership, its mandate, when it requested the "fairness opinion", when the "fairness opinion" was presented to the Special Committee (if at all), the substance of the Special Committee's conclusions, whether the Special Committee's recommendation was unanimous, whether Ergen recused himself from the discussions, or the identity of the Special Committee's advisors.  Moreover, the 8-K did not disclose that only two days earlier, on July 21, 2013, the Board had disbanded the Special Committee despite Howard and Goodbarn's insistence that the Committee should have an ongoing role in the deal discussions in light of Ergen's personal interests.

58.    On July 25, 2013, only two days after DISH made its $2.2 billion bid and four days after the Special Committee was disbanded, Howard abruptly resigned from the Board.  Howard's abrupt resignation left DISH at risk of being delisted from the NASDAQ because the Company no longer has enough Audit Committee members.  As disclosed by DISH in a Form 8-K filed with the SEC on July 31, 2013:

/ / /

Upon the effective date of the resignation of Gary S. Howard described below, DISH Network Corporation (the "Corporation") will no longer have three audit committee members as required by Rule 5605(c)(2) of the NASDAQ Listing Rules, and the Corporation provided the required notice to NASDAQ to this effect on July 31, 2013.  In the interim until this vacancy is filled, the Corporation will be relying on the cure period specified in Rule 5605(c)(4)(B) of the NASDAQ Listing Rules.

## VI.   HARBINGER SUES ERGEN AND DISH; HARBINGER AND LIGHTSQUARED SUBMIT THEIR OWN PLANS OF REORGANIZATION

59.   On August 6, 2013, LightSquared's controlling shareholder, Harbinger, filed a complaint against Ergen and DISH, seeking more than $4 billion in damages based on fraud and civil conspiracy claims.  The Harbinger Complaint alleges that Ergen improperly used Sound Point to purchase LightSquared debt as a strategic investor with the intent to use his control over DISH to implement a fraudulent scheme to obtain LightSquared's spectrum assets in the bankruptcy proceeding.  More specifically, the Harbinger complaint alleges that:

> Dish directly (or at least indirectly) controls Sound Point because (a) **Ergen controls and makes decisions for Dish**; (b) Dish acts through Ergen as its Executive Chairman; and (c) Ergen controls Sound Point.  In graphic terms:



> … Putting this in simple and practical terms, **when DISH makes a decision (as it has) to buy LightSquared's assets, that decision is made by and through Ergen**, Dish's Chairman.  Ergen, As Dish's Executive Chairman, is authorized to carry out that decision on behalf of Dish, and he similarly has the power to direct – and indeed *has* directed – Sound Point to facilitate that purchase by filing a plan to effectuate that transaction.  Dish's control of Sound Point is thus beyond peradventure.

60.   The Harbinger complaint further alleges that Ergen and DISH engaged in "fraudulent, bad faith conduct" aiming to "strip away Harbinger's control of LightSquared, and prevent Harbinger from competing with [Ergen and DISH] in the wireless broadband market."

61.   On August 22, 2013, LightSquared filed a notice of intent to intervene as a plaintiff in the Harbinger action.  Specifically, LightSquared joined the Harbinger action as a plaintiff to the

extent it seeks equitable disallowance of any claims in bankruptcy based on Ergen's debt purchases. In addition, LightSquared submitted a proposed reorganization plan contemplating an open bidding process that would be led by LightSquared itself (not the secured lenders, including Ergen) in which DISH could be denied "stalking horse bidder" status.

62.     On August 30, 2013, Harbinger filed its own reorganization plan proposing to pay off all creditors through the distribution of cash and new secured notes *without* selling LightSquared's spectrum assets.   DISH would fail to acquire the spectrum if Harbinger's plan succeeds.   Ergen, however, will still personally benefit as a result of his status as LightSquared's largest creditor.

63.     The Harbinger Specific Disclosure Statement submitted in connection with its reorganization plan asserts that "***DISH, the presumptive stalking horse purchaser is not a good faith purchaser***" as required by the Bankruptcy Code.   Harbinger's Specific Disclosure Statement further states that "[t]he Bankruptcy Code requires that a purchaser of a debtor's assets must act in good faith for the Bankruptcy Court to approve the sale" and that "Courts have held that misconduct including fraud, concealment of material facts, or other attempts to take grossly unfair advantage of other bidders destroys a purchaser's good faith").   Harbinger's Specific Disclosure Statement states in relevant part, when discussing the Harbinger Lawsuit, as follows:

> Specifically, the plaintiffs allege that Ergen fraudulently infiltrated the senior-most tranche of LightSquared LP's capital structure, secretly amassing at significant discounts to par, based on knowing misrepresentations of fact, a position as the single largest holder of the Prepetition LP Facility Claims.   In particular, Ergen purchased the debt through Sound Point – a new investment vehicle created for this purpose, whose connection to Ergen was deliberately concealed for over a year, despite diligent inquiries.   Ergen also disrupted Harbinger's efforts to negotiate a plan of reorganization with the Debtors' creditors by causing Sound Point to enter into binding commitments to purchase hundreds of millions of dollars of debt from existing lenders, but then refusing – without justification or excuse, and contrary to settled industry practice – to settle those trades.   Ergen used these same "hung trades" as a mechanism to interfere with Harbinger's efforts to raise exit financing for the Debtors.   The existing lenders with whom Ergen contracted,

and whose trades he refused to close – investment funds that were fully familiar with the Debtors and had extensive experience with the company and its long-term prospects – were the very same investment funds that would have served as lenders in the Debtors' exit financing facility that would have allowed the Debtors to pay all of its creditors in full and in cash.  Even absent the effects of Ergen's misconduct on Harbinger, the mere fact that Ergen succeeded in illegally purchasing LightSquared LP secured debt at a discount gives him an unfair advantage with respect to other bidders.  Inasmuch as Ergen's bid does little more than pay himself back on the illegally purchased debt, Ergen improperly has achieved a lower cost of purchase than any other buyer who played by the rules.

Harbinger believes, based on the facts alleged in the Ergen Litigation, that Ergen is not a good faith purchaser.

## VII.   ERGEN'S CONTINUED INVOLVEMENT JEOPARDIZES DISH'S BID

64.   Three years ago, the same bankruptcy court overseeing the LightSquared bankruptcy proceedings found DISH did not act in good faith when it purchased DBSD's debt as a "strategic investor" in an illicit effort to influence the bankruptcy proceedings so that it could obtain DBSD's spectrum rights.  *See In re DBSD*, 421 B.R. at 139-40.  Specifically, after purchasing DBSD's debt, DISH voted against the DBSD bankruptcy plan.  This plan would have stripped DISH of any equity interests or the right to execute upon DBSD's spectrum assets.  The bankruptcy court penalized DISH by disqualifying DISH's vote against the plan.  It further noted that DISH improperly intended to "use [its] status as a creditor to provide advantages over proposing a plan as an outsider, or making a traditional bid for the company or its assets."  *Id.*  The Bankruptcy Court's determination was upheld by the District Court for the Southern District of New York and Second Circuit Court of Appeals.  *See In re DBSD North America, Inc.*, 2010 WL 1223109 (noting "an abundance of evidence" that DISH had not acted in good faith), *aff'd in part and rev'd in part on other grounds*, 627 F.3d 496; and *In re DBSD North America, Inc.*, 634 F.3d at 104 (noting that "DISH purchased the claims as votes it could use as levers to bend the bankruptcy process toward its own strategic objective of acquiring DBSD's spectrum rights, not toward protecting its claim").

65.   Given the finding by the Bankruptcy Court, District Court and Second Circuit Court

of Appeals that DISH acted in bad faith in the DBSD bankruptcy proceedings when it tried to use its debt purchases as a strategic investor to obtain DBSD's spectrum rights, Ergen understood at all relevant times that his LightSquared debt purchases created a significant risk to DISH's ability to purchase LightSquared's spectrum assets.  However, Ergen did not inform the DISH Board about his purchases until after they were consummated.

66.    Ergen's conscious decision to withhold information about his debt purchases from the Board made it impossible for the Board or the Audit Committee to approve the related party debt transactions, to object to Ergen's purchases or otherwise to assess and/or mitigate the risk Ergen's actions posed to DISH's ability to acquire important spectrum assets.

67.    Ergen and the Board's conduct, including the Board's continued failure to remove Ergen from the LightSquared process and otherwise prevent Ergen from acting in his own interest rather than in the best interests of the Company, is harming and will continue to harm DISH. Indeed, unless DISH is able to show it is not part of a fraudulent conspiracy, which will be difficult given Ergen's conduct to date, there is a significant risk that the Bankruptcy Court will find that DISH followed a similar bad faith game plan for which the court  previously condemned DISH in the DBSD bankruptcy proceeding.  This could lead to the rejection of DISH's designee (LBAC) as a stalking horse purchaser and/or the adoption of the Harbinger Plan providing for a reorganization of LightSquared without the sale of LightSquared's spectrum assets.

68.    Moreover, Ergen may be willing to sacrifice DISH's opportunity to buy the spectrum to protect his personal investment in LightSquared debt.  Equally, if DISH were not doing Ergen's bidding it would pursue a consensual agreement with LightSquared, even if the price of consent is challenging Ergen's personal debt claims.  With Ergen in control of DISH's bidding, the Company and its public shareholders are the inevitable losers.

/ / /

**DERIVATIVE ALLEGATIONS**

69.     Plaintiff brings this action derivatively on behalf of nominal defendant DISH to redress injuries suffered by the Company as a direct result of the breaches of fiduciary duty by the Individual Defendants.

70.     Plaintiff has owned DISH common stock continuously since prior to the time of the wrongful course of conduct by the Individual Defendants alleged herein and continues to hold DISH common stock.

71.     Plaintiff will adequately and fairly represent the interests of DISH and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in shareholder derivative litigation.

**DEMAND ON THE DISH BOARD IS EXCUSED AS FUTILE**

72.     Plaintiff has not made a demand on the DISH Board to bring suit asserting the claims set forth herein because pre-suit demand was futile.

73.     As of the date of this Complaint, the Board consisted of nine directors: defendants Ergen, Cantey Ergen, Clayton, DeFranco, Goodbarn, Moskowitz, Ortolf, Vogel and Brokaw.  Seven of the nine members of the DISH Board lack independence from Ergen, the Company's controlling shareholder, whose misconduct is at the heart of this Complaint.  Thus, at least half of the Board was incapable of making an impartial decision regarding this action and demand is excused. Specifically:

> a.     **Charles Ergen**, DISH's admitted controlling shareholder, is not disinterested with respect to determining whether to initiate and aggressively prosecute this action.  Ergen stands to personally gain hundreds of millions of dollars as a result of his investments in LightSquared.  Pursuing this litigation on behalf of DISH could jeopardize Ergen's investments in LightSquared.  Since pursing the claims asserted in this Complaint is antithetical to Ergen's substantial personal economic interests, he cannot impartially consider a demand;

> b.     **Cantey Ergen**, as the wife of Charles Ergen, is not able to fairly and impartially consider a demand to initiate an action that could restrain

21

her husband's continued involvement in the LightSquared bidding and prevent her husband (and her family) from reaping hundreds of millions of dollars in potential profits on Ergen's LightSquared debt purchases;

c.   **James DeFranco**, the co-founder of DISH with Charles and Cantey Ergen, is unable to legitimately consider a demand to initiate this action.  DeFranco and Ergen's close personal relationship dates back more than 30 years.  DeFranco has worked closely with Ergen for the last thirty years, as he has been and continues to be one of the Company's Vice Presidents and a member of the Dish Board since the Company's founding.  DeFranco has become incredibly wealthy as a result of his friendship and partnership with Ergen.  According to the 2013 DISH Annual Meeting Proxy, DeFranco owns 4,576,027 shares of DISH Class A common stock, which based on DISH's closing stock price of $45.22 on August 2, 2013, are worth approximately $206,927,941.  DeFranco's long-standing personal and professional relationship with Ergen, as well as his continued status as an officer of the Company, prevents him from independently considering a demand;

d.   **Joseph Clayton** is not independent because, in addition to his Board service, he is DISH's President and CEO.  When Ergen decided to step down as DISH's CEO in 2011, he personally selected Clayton to succeed him.  For his service, Clayton received total compensation of $907,000 and $9,845,632 in 2012 and 2011, respectively.  Clayton's 2011 compensation included $9,071,625 of DISH option awards.  Upon information and belief, this compensation is material to Clayton, and initiating this action would jeopardize Clayton's continued receipt of this compensation and the other privileges of being CEO of DISH.   Thus, Clayton is not able to fairly and impartially consider a demand to bring this action;

e.   **David Moskowitz** was hired by Ergen in 1990 to serve as the Company's General Counsel.   Moskowitz continued serving as DISH's top legal officer for the next seventeen years, retiring in 2007.  Even after his retirement, Moskowitz's relationship with Ergen and DISH has continued.  During 2012, DISH employed Moskowitz as a senior advisor to the Company and paid him a salary and bonus totaling $250,000.   According to the 2013 Proxy, the Company expects to continue Moskowitz's employment as a senior advisor to DISH during 2013.  Between 1998 and 2007 when Moskowitz left his executive role, he earned over $6 million in total compensation.  According to the 2013 Proxy, Moskowitz owns 944,352 shares of DISH Class A common stock, which based on DISH's closing stock price of $45.22 on August 2, 2013, are worth approximately $42,703,597.  Further evidencing Moskowitz's close relationship with Ergen, Ergen selected Moskowitz to serve as trustee for certain trusts established for the benefit of Ergen's children.  Moskowitz's long and

lucrative tenure as DISH's General Counsel, continued role as a DISH senior advisor and position as an Ergen family confidant prevents him from asserting independent judgment and he is, therefore, unable to objectively consider a demand;

f. **Carl Vogel** was hired by Ergen in 1994 to serve as a Company executive. In 1995, Ergen promoted Vogel to the position of Company President, a role in which Vogel served until 1997. In 2005, Ergen brought Vogel back to DISH to serve as the Vice Chairman of the DISH Board, a role in which he would serve until March 2009. In September 2006, Ergen appointed Vogel as the Company's President. Vogel then served in this role until February 2008. From 2006 through 2008, Vogel received total compensation of over $9 million as President and a director of the Company. Even after retiring as the Company's President, Vogel has continued to work for DISH as a senior advisor and serve as a DISH director. During his multiple stints as a DISH executive, Ergen rewarded Vogel with a large amount of DISH Class A common stock. According to the 2013 DISH Annual Meeting Proxy, Vogel owns 357,244 shares of DISH Class A common stock, which based on DISH's closing stock price of $45.22 on August 2, 2013, are worth approximately $16,154,574. Vogel's loyalty to Ergen has been further solidified through Vogel's board service on Ergen's other controlled company EchoStar. From October 2007 until March 2009, Vogel served as the Vice Chairman of the board of directors of, and as a senior advisor to, EchoStar. As a result of his multiple tenures as DISH's President, continued service as a senior advisor to the Company and board service at EchoStar, Vogel is not able to fairly and impartially consider a demand; and

g. **Tom Ortolf** was hired by Ergen to serve as DISH's President and Chief Operating Officer from 1988 until 1991. In 2005, Ergen brought Ortolf back to DISH to serve as a director. During his more than seven years as a DISH director, Ortolf has received total directorship fees of approximately $730,000. Ergen also added Ortolf to the board of directors of EchoStar in 2007 and rewarded him with over $520,000 in additional directorship fees over the last five years. Ortolf's former employment under Ergen and lucrative board service at both DISH and EchoStar prevents him from asserting independent judgment and he is, therefore, unable to objectively consider a demand.

74. In addition, the Complaint, which involves a controlling shareholder standing on both sides of a transaction, must be reviewed under the exacting entire fairness standard. In an entire fairness case, the defendants bear the burden to demonstrate the transaction in question is entirely fair to the company. This burden cannot be met at the pleading stage.

23

# COUNT I

## AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY

75.    Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

76.    Defendant Ergen, as a controlling shareholder and DISH director, is a fiduciary of the Company and its public stockholders.  Ergen therefore owes to DISH and its stockholders a duty to act with the utmost loyalty, candor, good faith and fair dealing.

77.    The Individual Defendants, as members of the Board, are fiduciaries of the Company and its public stockholders.   The Individual Defendants therefore owe the Company and its stockholders the duty to act with the utmost loyalty, candor, good faith and fair dealing.

78.    Ergen's actions in becoming LightSquared's largest creditor despite knowing DISH's interest in acquiring LightSquared, together with his control over DISH's bid to acquire LightSquared from bankruptcy, have resulted in the Harbinger Lawsuit and other bankruptcy submissions (including the Harbinger reorganization plan and LightSquared's proposed open auction) that collectively seek billions of dollars in damages against DISH, seek to reject Ergen's debt claims in the bankruptcy process, seek to deny DISH's ability to enjoy the benefits of being the stalking horse bidder in the LightSquared bidding process, and seek other equitable remedies that can impair or derail DISH's ability to acquire LightSquared or its spectrum assets through the Chapter 11 bankruptcy process.

79.    Because the Individual Defendants are continuing to allow Ergen to interfere with and influence DISH's actions with respect to the LightSquared bankruptcy, they are continuing and increasing the risk that DISH will suffer of billions of dollars of monetary damages and that DISH's ability to acquire LightSquared will be derailed or impaired.

80.    The opportunity to acquire LightSquared in connection with the bidding process set to close on December 6, 2013 is a unique opportunity, the impairment of which is irreparable.

24

81.     Absent injunctive relief barring Ergen and the other Individual Defendants from further interfering with or influencing DISH's efforts to buy LightSquared, Defendants' ongoing breaches of fiduciary duty will continue, causing irreparable harm to DISH.

82.     Plaintiff does not have an adequate remedy at law.

**COUNT II**

**AGAINST ERGEN FOR BREACH OF FIDUCIARY DUTY**

83.     Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

84.     Defendant Ergen, as a controlling shareholder and DISH director, is a fiduciary of the Company and its public shareholders.  Ergen therefore owes to DISH and its stockholders a duty to act with the utmost loyalty, candor, good faith and fair dealing.

85.     Around the time LightSquared filed for bankruptcy, its debt was trading around fifty cents on the dollar.  Defendants Ergen, as part of his work on DISH's behalf to identify opportunities to acquire much-coveted spectrum assets, saw the personal opportunity to purchase the majority of LightSquared's secured debt at a discount and provide himself with a windfall if and when DISH paid a premium to acquire LightSquared's assets (*i.e.*, spectrum) upon the company's emergence from bankruptcy.  Ergen was obligated to disclose to the Board and Audit Committee his intent to purchase LightSquared debt.  Defendant Ergen did not do so.  Instead, Ergen surreptitiously and in breach of his duty of loyalty acquired over one billion dollars of LightSquared debt, thus becoming LightSquared's largest secured creditor.

86.     As a result of Ergen's actions, the Company has been and will be damaged.

87.     Plaintiff has no adequate remedy at law.

/ / /

/ / /

25

## COUNT III

### AGAINST ERGEN FOR UNJUST ENRICHMENT

88.    Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

89.    By obtaining  profits on his LightSquared debt purchases, Ergen will be unjustly enriched at DISH's expense because he identified and pursued the opportunity using confidential DISH information that he obtained in his capacity as DISH's Chairman.

90.    Ergen should be subject to an order of disgorgement or the award of money damages for any profits he obtains through his misappropriation of DISH information and breach of his duty of loyalty.

91.    Plaintiff does not have an adequate remedy at law.

### RELIEF REQUESTED

**WHEREFORE**, Plaintiff demands judgment as follows:

A.    Enjoining Ergen and the other Individual Defendants from continuing to interfere with or influence DISH's efforts to acquire LightSquared or any of its assets;

B.    Ordering the disgorgement of any profits that Ergen has received or will receive as a result of his purchase of LightSquared's debt;

C.    Awarding damages, together with pre- and post-judgment interest, to the Company;

D.    Granting appropriate equitable relief to remedy Ergen and the other Individual Defendants' misconduct;

E.    Awarding Plaintiff the costs and disbursements of this action, including attorneys', accountants', and experts' fees; and

F.    Awarding such other and further relief as is just and equitable.

/ / /

/ / /

/ / /

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims set forth herein.

Dated: October 2, 2013

/s/ John P. Aldrich
John P. Aldrich
**ALDRICH LAW FIRM, LTD.**
1601 S. Rainbow Blvd., Suite 160
Las Vegas, NV 89146
Telephone: (702) 853.5490
Facsimile: (702) 227-1975

**KESSLER TOPAZ
   MELTZER & CHECK, LLP**
Eric L. Zagar
James H. Miller
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

*Attorneys for Plaintiff*

27

# VERIFICATION

I, Stephen E. Conley, hereby verify that I have authorized the filing of the attached Verified Shareholder Derivative Complaint on behalf of Iron Workers District Council (Philadelphia and Vicinity) Retirement and Pension Plan, that I have reviewed the Verified Shareholder Derivative Complaint, and that the facts therein are true and correct to the best of my knowledge, information and belief.  I declare under penalty of perjury that the foregoing is true and correct.

DATE:  9/30/13

Mr. Stephen E. Conley, Co-Plan Administrator

Iron Workers District Council (Philadelphia and Vicinity) Retirement and Pension Plan